IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | | |
|---|---|---|
| J.S., by and through his parents, Lotus and Charles S., | ) ) ) | CV. NO. 10-00022 DAE-LEK |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | |
| DEPARTMENT OF EDUCATION, State of Hawaiʻi, | ) ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |

ORDER AFFIRMING IN PART AND REVERSING IN PART
<u>DECISION OF HEARINGS OFFICER</u>

On July 26, 2010, the Court heard Plaintiff's appeal of a decision rendered by an administrative hearings officer concerning the appropriateness of a student's individualized education program.  John P. Dellera, Esq., and Roy M. Benavidez, Esq., appeared at the hearing on behalf of Plaintiff, Deputy Attorney General Kris S. Murakami appeared at the hearing on behalf of Defendant Department of Education ("DOE").  After reviewing the appeal, and the supporting and opposing briefs, the Court **AFFIRMS IN PART AND REVERSES IN PART** the Hearings Officer's Findings of Fact, Conclusions of Law and Decision.

## BACKGROUND

Defendant is the State of Hawai`i Department of Education ( "DOE"). Plaintiff is J.S., a nine-year-old boy with Down Syndrome, who has mild to moderate mental retardation, hypothyroidism, left eye amblyopia, right upper eyelid ptosis, moderate to severe hearing loss in the left ear and mild hearing loss in the right ear.  ("Appeal," Doc. # 22.)  J.S.' appeal is made by and through his parents, Lotus and Charles S. ("Parents").  J.S. is eligible to receive special education and related services under the Individuals with Disabilities Education Act of 2004 ("IDEA"), 20 U.S.C. §1415, and Chapter 56, Hawai`i Administrative Rules ("HAR") in the category of Hearing Impairment.  (Id.)  J.S. has been IDEA-eligible since 2003 and was placed at Loveland Academy ("Loveland") for the 2007-2008 and 2008-2009 school years pursuant to a hearings officer's decision. (Id.; Resp. Ex. 17 at JS 153.)  JS's home school during the 2008-2009 school year is Maemae Elementary School ("MES").  (Id.; "Opp'n," Doc. # 23 at 7.)

On February 19, 2009, at a meeting to discuss J.S.' IDEA eligibility pursuant to his triennial reevaluation (Resp. Ex. 3 at JS 10), Parents requested that J.S. undergo a functional vision assessment.  (Resp. Ex. 6 at JS 79.)  The DOE advised Parents in a Prior Written Notice (PWN") issued the same date, that "[a] functional vision assessment [could not] be completed without a current eye

2

examination."  (Id.; Transcript "Tr." at 233 & 349.)  Accordingly, Parents had J.S.

examined by opthamologist, Peggy M. Liao, M.D., on March 3, 2009.  (Resp. Ex.

17 at JS 181.)  On March 13, 2009, Dr. Liao found that J.S.' vision was not

severely impaired based upon testing of his visual acuity, but recommended

considering that J.S.' vision be assessed because he "lack[ed] depth perception."

(Id.)  The report also showed that J.S. has a history of treatment for "upper eyelid

ptosis" (eyelid droops over the eye) and left eye amblyopia. (Id.)  The DOE denied

Parents' request for a DOE vision assessment for J.S. because J.S. did not qualify

as "visually impaired" under DOE criteria (Id. at  JS 182), and therefore, was not

qualified to obtain a functional vision assessment.  (Resp. Ex. 6 at JS 84.)

However, MES indicated that it would contact the district "for a screening for J.S."

(Id.)  It is unclear from the record to what this referred or if any screening

occurred.

   Individualized Educational Program ("IEP") meetings were held on

March 31, 2009 and April 21, 2009, in order to develop an IEP for J.S.  (the IEP

meetings and IEPs developed are collectively referred to herein as J.S.' "IEP")

(Resp. Ex. 5 at JS 47-76; Resp. Ex. 17 at JS 170-86.)  The IEP changed J.S.'

placement from Loveland to a "Total Communication Program" at a public school

campus, Lincoln Elementary School ("Lincoln").   (Resp. Ex. 5 at JS 47-76.)

On or about July 1, 2009, Plaintiff J.S. submitted a Request for Impartial Hearing ("Request") under the Individuals with Disabilities Education Act ("IDEA").  (Resp. Ex. 1.)  In his Request, Plaintiff raised concerns regarding J.S.' IEP.  (Id.)  Specifically, Plaintiff raised the following allegations regarding the IEP: 1) J.S. needs specialized instruction to address his hearing loss, speech or behavioral deficits; 2) J.S. needs multi-sensory instruction; 3) J.S. needs a smaller class size, teachers/aides who have experience with children with Down syndrome and mental health treatment; 4) J.S. needs teachers/aides who can utilize American Sign Language; 5) J.S. requires a visual assessment; 6) J.S. requires ESY services for breaks longer than three days.

The administrative hearing was heard before the Department of Commerce and Consumer Affairs, Office of Administrative Hearings, State of Hawai'i ("OAH") on October 14, 15, and 16, 2009 before Hearings Officer Haunani H. Alm.  (Administrative Record ("Admin. Rec.") Exs. 6, 11.)  The Hearings Officer's Findings of Fact, Conclusions of Law and Decision ("Decision") (DOE-SY0910-001) was entered on December 11, 2009, and assigned J.S. to the Total Communication Program at Lincoln.  (Id. Ex. 11.)

Plaintiff J.S. filed a complaint with this Court on January 13, 2010, pursuant to 20 U.S.C. § 1415(i)(2)(A) for declaratory and injunctive relief from the

4

December 11, 2009 Decision by the Administrative Hearings Officer pursuant to

the IDEA.   ("Compl.," Doc. # 1.)  Plaintiff appeals the Hearings Officer's decision

on the grounds that: 1) the DOE failed to adequately assess J.S.' vision

impairment, and thus did not adequately address this need in his special education

and related services; 2) the DOE's proposed educational program is substantively

deficient in that a) placement in a "Total Communication Program" is not

appropriate because it focuses on the use American Sign Language ("ASL") rather

than verbal communication which is J.S.' communication mode; b) the

communication goals are inappropriate; c) the amount of speech therapy is

inappropriate; d) the DOE's offer of Extended School Year ("ESY") services is

also inappropriate; and e) there was no proof that Lincoln teachers had experience

with working with deaf children with Down Syndrome; and 3) the appropriate

placement is at Loveland Academy.[1]  (See Compl., Counts I-VI)  Plaintiff's

Complaint seeks a reversal of the Hearings Officer's Decision, a finding that the

DOE denied Plaintiff a free and appropriate public education, reimbursement of

---

[1] Plaintiff also indicates in his Complaint that Parents were denied
meaningful participation in developing J.S.' April 2009 IEP, although this claim
was not alleged as a specific Count.  (See Compl.)  In the instant Appeal, Plaintiff
appears not to be asserting this claim.  (See Appeal.)  The Court notes that the
administrative record evidences Parents' opportunity for meaningful participation
at the first and second IEP meetings.  (See Resp. Ex. 17 at JS 170-86.)

tuition for J.S. resulting from Parents' unilateral decision to place J.S. at Loveland

for the 2009-2010 school year including ESY services, transportation costs, and

attorneys' fees and costs.  (Id. at 10-11.)

Plaintiff's opening brief was filed on June 1, 2010.  ("Appeal," Doc.

# 23.)  DOE filed its opposition brief on June 29, 2010.  ("Opp'n," Doc. # 24.)  On

July 13, 2010, Plaintiff replied.  ("Reply," Doc. # 24.)

## STANDARD OF REVIEW

The IDEA states in part:

> [a]ny party aggrieved by the findings and decision made
> [pursuant to an administrative hearing], shall have the
> right to bring a civil action with respect to the complaint
> presented pursuant to this section, which action may be
> brought in any state court of competent jurisdiction or in
> a district court of the United States, without regard to the
> amount in controversy.

20 U.S.C. § 1415(i)(2)(A).

When a party files an action challenging an administrative decision

under the IDEA, a district court "(i) shall receive the records of the administrative

proceedings; (ii) shall hear additional evidence at the request of a party; and (iii)

basing its decision on the preponderance of the evidence, shall grant such relief as

the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C); see also Ojai

Unified Sch. Dist. v. Jackson, 4 F.3d 1467, 1471 (9th Cir. 1993).  The party

challenging the administrative decision bears the burden of proof.  See Seattle Sch.

Dist., No. 1 v. B.S., 82 F.3d 1493, 1498 (9th Cir. 1996); Hood v. Encinatas Union

Sch. Dist., 486 F.3d 1099, 1103 (9th Cir. 2007).

"[J]udicial review in IDEA cases differs substantially from judicial

review of other agency actions, in which courts generally are confined to the

administrative record and are held to a highly deferential standard of review." Ojai

Unified Sch. Dist., 4 F.3d at 1471.  District courts have discretion concerning how

much deference to give to state educational agencies.  Gregory K. v. Longview

Sch. Dist., 811 F.2d 1307, 1311 (9th Cir. 1987).  Courts need not follow the

traditional test that findings are binding if supported by substantial evidence or

even a preponderance of the evidence.  Id.  A court may not, however, simply

ignore the administrative findings.  Ojai Unified Sch. Dist., 4 F.3d at 1474.  Given

the expertise of the administrative agency and the political decision to vest the

initial determination with the agency, deference to the hearing officer is warranted

in cases where the officer's findings are "careful and thorough."  Id. (citing

Kerkam v. McKenzie, 862 F.2d 884, 887 (D.C. Cir. 1988)); Capistrano v. Unified

Sch. Dist. v. Wartenberg, 59 F.3d 884, 891 (9th Cir. 1995).  In the end, district

courts are free to determine how much deference to accord decisions of a hearing

officer in light of the circumstances.  County of San Diego v. Cal. Spec. Educ.

Hearing Office, 93 F.3d 1458, 1466 (9th Cir. 1996) (a court should give deference

to the Hearing Officer's decision "when it 'evinces his [or her] careful, impartial

consideration of all the evidence and demonstrates his [or her] sensitivity to the

complexity of the issues presented.").

Further, how much deference is to be given to an administrative

hearing officer's decision is, in part, influenced by whether the hearing officer's

findings are based on credibility determinations regarding the witnesses that

appeared before him or her.  See L.E. v. Ramsey Bd. of Educ., 435 F.3d 384, 389

n.4 (3rd Cir. 2006) (a district court must accept the state agency's credibility

determinations "unless the nontestimonial, extrinsic evidence in the record would

justify a contrary conclusion.") (citation omitted); see also Seattle School Dist. No.

1, 82 F.3d at 1499 (citations omitted).

## DISCUSSION

The IDEA was enacted, "[t]o ensure that all children with disabilities

have available to them a free appropriate public education that emphasizes special

education and related services designed to meet their unique needs and prepare

them for further education, employment, and independent living . . . ."  20 U.S.C. §

1400(d)(1)(A) (2009).  As a condition of federal financial assistance under the Act,

states must provide disabled children residing in the state between the ages of 3

and 21, inclusive, with a free appropriate public education ("FAPE").  20 U.S.C. §

1412(a)(1)(A).

FAPE, as defined in the Act, must include special education and

related services that: (a) have been provided at public expense, under public

supervision and direction, and without charge; (b) meet the standards of the state

educational agency; (c) include an appropriate preschool, elementary school, or

secondary school education in the state involved; and (d) are provided in

conformity with the individualized education program.  20 U.S.C. § 1401(9); 34

C.F.R. §300.17.  In Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley,

458 U.S. 176 (1982), the United States Supreme Court established a two-part test

to determine whether a state has provided a FAPE.  "First, has the State complied

with the procedures set forth in the Act? And second, is the individualized

educational program developed through the Act's procedures reasonably calculated

to enable the child to receive educational benefits?"  Id. at 206-207.

In essence, Rowley is viewed as requiring both procedural and

substantive compliance with the strictures of the IDEA.  See M.L. v. Fed. Way

Sch. Dist., 394 F.3d 634, 644 (9th Cir. 2005).  A court need not reach the question

of substantive compliance if the court finds "'procedural inadequacies that result in

the loss of educational opportunity, or seriously infringe the parents' opportunity to

participate in the IEP formulation process, or that caused a deprivation of educational benefits.'" <u>Ms. S. ex rel. G. v. Vashon Island Sch. Dist.</u>, 337 F.3d 1115, 1129 (9th Cir. 2003) (quoting <u>Amanda J. ex rel. Annette J. v. Clark County School Dist.</u>, 267 F.3d 877, 892 (9th Cir. 2001)).  The United States Supreme Court discussed the issue of IDEA "reasonableness" in <u>Florence County School District Four v. Carter</u>, 510 U.S. 7 (1993).  There, the Supreme Court stated that:

> Moreover, parents who . . . unilaterally change their child's placement during the pendency of review proceedings without the consent of state or local school officials, do so at their own financial risk.  They are entitled to reimbursement <u>only</u> if a federal court concludes both that the public placement violated IDEA and that the private school placement was proper under the Act.

<u>Id.</u> (internal marks, quotations and citations omitted).

In the instant Appeal, Plaintiff identifies five issues:  (1) the Hearings Officer committed clear error when she found that the DOE teacher for the visually impaired properly determined that J.S. was not "visually impaired" for the purpose of obtaining a visual assessment; (2) the Hearings Officer committed clear error when she found that the evidence provided by the DOE speech-language pathologist, DOE Teacher of the Visually Impaired, the DOE Itinerant Teacher of the Visually Impaired, and the DOE School Psychologist showed that the program and placement offered to J.S. in the Total Communication Program was necessary

for J.S. to address his speech, language, communication, and academic needs; (3) the Hearings Officer committed clear error when she found the goals and objectives contained in J.S.' IEP were appropriate for J.S.' needs and were developed based on the recent assessments conducted pursuant to his triennial evaluation in the following areas: academic, behavior, cognitive, speech language, hearing, fine and gross motor skills, social/family, and adaptive skills; (4) the Hearings Officer committed clear error when she found that J.S.' IEP provision that provided J.S. with ESY services after breaks of more than five school days was based on credible evidence and was sufficient to meet J.S.' needs; and (5) the Hearings Officer committed clear error when she found that the March 31, 2009 and April 21, 2009 IEP's provided J.S. with appropriate amounts of minutes of direct speech therapy and that Parents did not provide sufficient evidence to show that the speech language program in the Total Communication Program did not meet his needs or that he required additional intensive speech therapy.  (Appeal at 8-21.)

The DOE argues that it offered Plaintiff J.S. a free appropriate public education ("FAPE") in the J.S.' IEP by: 1) providing J.S. with specialized instruction in a Total Communication Program which provides multisensory teaching to meet J.S.' unique educational needs, in particular his bilateral hearing

loss for which he is qualified to receive services under the IDEA; 2) providing oral testimony that the special education teacher at the Lincoln Total Communication Program is certified to teach the hearing impaired; 3) providing oral testimony that all the one-to-one educational assistants ("EAs") are extensively trained to assist in the teaching of the hearing impaired; 4) showing that the Lincoln Total Communication Program is the Least Restrictive Environment for J.S. in that it will provide J.S. with daily opportunities to interact with neurotypically developing peers; 5) providing expert testimony through the school psychologist which showed that J.S.' behaviors did not warrant placing him in Loveland; 6) providing both oral and written testimony which showed that despite the repeated efforts by MES to obtain information from Loveland through observations conducted by MES personnel or written data prepared by Loveland, Loveland did not allow MES to conduct a classroom observation of J.S. prior to the April 21, 2009 IEP meeting and did not produce any written data to MES that would demonstrate J.S.' current level of functioning;[2] 7) providing evidence through expert testimony which

---

[2] The Court notes that contrary to the DOE's assertions that no written data was produced that would demonstrate J.S.' current level of functioning, the IEP team had access to Loveland's records on J.S.' current educational performance (Resp. Ex. 17 at JS 156-65) and an assessment from J.S.' teacher (Resp. Ex. 17 at JS 176). The IEP team also considered extensive evaluations from the Hawaii Center for the Deaf and Blind regarding an assessment of J.S.' adaptive

(continued...)

clearly showed that J.S. did not meet the DOE criteria for "visual impairment" which would warrant a referral for a visual assessment; and 8) showing that Parents did not provide any data to MES that would indicate that J.S. required ESY services for breaks longer than three days despite repeated efforts made by MES to have this information provided to it.  (Opp'n at 2-3.)

I.     Alleged Procedural Violations

Preliminarily, Plaintiff alleges that the DOE's failure to provide J.S. with a visual assessment prior to developing his IEP is a procedural violation of the IDEA.  (Appeal at 8-13.)  A procedural violation constitutes a denial of a FAPE only if the violation: (1) impeded the child's right to a FAPE; (2) significantly impeded the parent's opportunity to participate in the decision-making process; or (3) caused a deprivation of educational benefits.  20 U.S.C. § 1415(f)(3)(E)(ii).

As the Ninth Circuit has recognized, there is some leeway in the procedural requirements:

---

[2](...continued)
functioning, (Resp. Ex. 8 at JS 92-95), educational evaluation (Resp. Ex. 9 at JS 96-101), an intellectual evaluation (Resp. Ex. 10 at JS 102-105), a speech language evaluation (Resp. Ex. 11 at JS 106-123), an audiological assessment (Resp. Ex. 12 at JS 124), a functional behavior assessment (Resp. Ex. 13 at JS 125-134), a gross motor assessment (Resp. Ex. 14 at JS 135-37), and a fine motor assessment (Resp. Ex. 15 at JS 138-41).

> Not every procedural violation, however, is sufficient to support a finding that the child in question was denied a FAPE. Technical deviations, for example, will not render an IEP invalid. On the other hand, procedural inadequacies that result in the loss of educational opportunity, or seriously infringe the parents' opportunity to participate in the IEP formulation process, or that caused a deprivation of educational benefits, clearly result in the denial of a FAPE.

Amanda J., 267 F.3d at 892 (citations and internal quotations and marks omitted).

The procedural safeguards which may give rise to a procedural complaint are found at 20 U.S.C. § 1415(b). Although not necessarily an exhaustive list,[3] the statute describes several procedural protections such as: (1) an opportunity for parents to examine all records and obtain an independent evaluation of the child (§ 1415(b)(1)); (2) written notice to the parents whenever there is a proposal to change the IEP (§ 1415(b)(3)); and (3) the right of the parent to present a complaint with respect to the eligibility of the child for services or regarding his or her IEP (§ 1415(b)(6)). Amanda J., 267 F.3d at 882. These safeguards establish procedures for the creation of an IEP and review of its content. See Van Duyn ex rel. Van Duyn v. Baker School Dist. 5J, 502 F.3d 811, 818 (9th Cir. 2007).

---

[3] For instance, DOE may also be bound by procedural safeguards established by individual states. See 20 U.S.C. § 1415(a).

A public agency must ensure that a reevaluation of each child with a disability is conducted in accordance with  20 U.S.C. §1414(b) and (c) and 34 C.F.R. §§ 300.304 through 300.311 "[i]f the child's parent or teacher requests a reevaluation." 20 U.S.C. § 1414(a)(2)(A)(ii) ; 34 C.F.R. §300.303(a)(2); N.B. v. Hellgate, 541 F.3d 1202, 1209 (9th Cir. 2008).  Therefore, a student suspected of having a disability must be reevaluated "[i]n all areas related to the suspected disability, including, if appropriate, health, vision, hearing, social and emotional status, general intelligence, academic performance, communicative status, and motor abilities[]" 34 C.F.R. §300.304(c)(4); see also, 20 U.S.C. § 1414(b)(3)(B). A school district's failure to assess in all areas of suspected disability may constitute a procedural denial of a FAPE.  Park v. Anaheim Union High Sch. Dist., 464 F.3d 1025, 1031-33 (9th Cir. 2006).

Plaintiff alleges that the testimony at the administrative hearing showed that as early as preschool, J.S. exhibited behavior that indicated problems with his vision. (Tr. at 231-32.)  In the first grade, J.S.' special education teacher, Ti Wong, advised J.S.' mother to have J.S.' vision assessed.  (Id. at 232:3-7.)  As stated above, in conjunction with his February 19, 2009 re-evaluation, J.S.' Parents requested a visual assessment from the DOE.  This first request was denied because the DOE does not conduct a visual assessment without an eye

15

examination.  (Resp. Ex. 6 at JS 79.)  After J.S.' parents obtained the eye

examination, the DOE denied Parents' request because J.S.' visual acuity was

20/80 in the left eye and was 20/40 in the right eye, which did not meet DOE

requirements for an assessment.  (Tr. at 501; Resp. Ex. 17 at JS 182); see Hawaii

Administrative Rules ("HAR") § 8-56-29[4] (now codified at HAR § 8-60-39(n)).[5]

     The Hearings Officer made a finding that in denying J.S. a visual

assessment, the DOE had relied on the Department of Education teacher for the

---

[4]  The Court notes that this statute was repealed November 23, 2009, prior to
this Court's hearing but subsequent to the Hearings Officer's decision on this
matter.

[5] HAR § 8-60-39(n) provides:

Visual disability including blindness. A student shall be eligible for
the disability category of visual disability, including both partial sight
and blindness, if the impairment in vision, even with the best
correction, adversely affects the student's educational performance
and one or more of the following are met:

(1) Partially-sighted. The student's visual acuity is 20/70 to 20/200 in
the better eye and with the best correction;

(2) Blind. The student's visual acuity is 20/200 in the better eye and
with the best correction, or less, or the student has a subtended visual
field of less than 20 degrees, regardless of central visual acuity;

(3) The student has a progressive visual impairment, such as retinitis
pigmentosa, that will lead to eventual visual disability as set forth in
paragraphs (1) and (2).

visually impaired's review of J.S.' ophthalmology evaluation, which determined that J.S. was not "visually impaired" for the purpose of obtaining a visual assessment.  (Decision ¶¶ 32, 33; <u>id.</u> at 15; Resp. Ex. 17 at JS 182.)

Plaintiff argues that the Hearings Officer failed to consider the possibility that J.S.' history of droopy right upper eyelid (ptosis) or amblyopia adversely affected J.S.' vision, and that therefore, these conditions caused vision impairment because they limited the vision in J.S.' good eye.  (Appeal at 10-11.) Plaintiff further argues that the DOE's use of the visually impaired criteria as a prerequisite for a full assessment of all suspected visual disabilities violates the IDEA.  (<u>Id.</u>)

In support of this latter argument, Plaintiff states that the IDEA's implementing regulations define visual impairment as "an impairment in vision that, even with correction, adversely affects a child's educational performance . . . ." 34 C.F.R. §300.8 (13).  Plaintiff argues that the DOE's rules are more narrow, in that they define visual impairment solely in terms of visual acuity of the kind measured by the DOE.  (Appeal at 11.)  Moreover, Plaintiff states that HAR § 8-56-29 sets forth standards by which to determine the category of eligibility for services under the IDEA, but it does not limit the DOE's obligation to conduct a thorough assessment as to eligibility under the IDEA.  (<u>Id.</u> at 10.)

17

Plaintiff argues that the DOE's obligation to assess all areas of suspected

disabilities is absolute.  (Id. (citing Pasatiempo v. Aizawa, 103 F.3d 796, 802 (9th

Cir. 1996) (holding that a parent's "informed suspicions" of disability is sufficient

to trigger the obligation to assess because Congress intended the procedural

protections to require school districts to respond adequately to parental concerns);

Hellgate, 541 F.3d at 1208-10 (holding that a school district's failure to evaluate a

student suspected of having autism made it impossible for the IEP team to develop

a plan reasonably calculated to provide the student with a meaningful educational

benefit); Amanda J., 267 F.3d at 894 (holding that a district's failure to obtain

critical medical information about whether a child has autism renders the

accomplishment of the IDEA's goals—and the achievement of a

FAPE—impossible); Union Sch. Dist. v. Smith, 15 F.3d 1519, 1523 (9th Cir.

1994) (holding that a parent's failure to secure an evaluation, even if the parents

agreed to obtain it, does not excuse the school district's obligation under the IDEA

to procure the same information for itself).)

        In this case, the Court finds that there is no evidence in the record to

contradict the Hearings Officer's findings that J.S. is not "visually impaired" for

the purpose of obtaining a DOE visual assessment.  Further, the Court finds that

the DOE's actions of requesting that J.S. obtain an eye examination and

subsequently consulting with the Department of Education teacher for the visually

impaired, Jeannie Camacho, demonstrate that the DOE investigated and evaluated

Parents' claims that J.S. had a vision impairment and accordingly complied with

the IDEA in assessing J.S.' disabilities.  As to Plaintiff's arguments that the DOE's

definition of visual impairment is defined in a limited fashion pursuant to HAR §

8-60-39, it appears to the Court that Parents' request for an assessment of J.S.'

"visual problems" seems to have been conducted in the scope of J.S.' fine motor

skills assessment—Plaintiff has simply petitioned for the wrong service.  As

explained further below, here, the DOE is not required to broaden its definition of

"visual impairment" and a parent's request should be specific within the DOE

criteria as to the category in which their child has a disability in order to avoid

frustration through the system.

A visual assessment is an assessment which is conducted only for

individuals who are "visually impaired."  Id.  According to HAR § 8-56-29,[6]

operative at the time of Plaintiff's request, in order to request a visual assessment

the student must have been seen by his eye doctor within the last year and must

have provided the DOE with a copy of the eye report which provides, inter alia, a

_____

[6] The Court notes that this statute was repealed on November 23, 2009, prior
to this Court's hearing but subsequent to the Hearings Officer's decision on this
matter.

19

diagnosis, the child's visual acuities, and a history of treatment.  (Tr. at 497-98,

501.)  HAR § 8-60-39(n) sets forth the three criteria under any of which a child

may be determined eligible under the category of visual impairment:

> 1) vision is at least 20/70 in the better eye with best correction;[7]
> 2) vision has a restrictive field of 20 degrees or less; or
> 3) a progressive visual impairment is present.

(See Resp. Ex. 17 at JS 182.)

   The DOE Teacher of the Visually Impaired, Jeannie Camacho

("Camacho"), qualified below by the Hearings Officer as an expert witness in the

area of special education and specifically in the area of teaching of the visually

impaired (Tr. at 495-97), was contacted by the IEP team to determine whether a

functional vision assessment was necessary for J.S.  (Resp. Ex. 17 at JS 182;

Decision ¶¶ 32-33.)  Camacho explained that a functional vision assessment

determines how a child uses his/her vision functionally in his/her environment and

based on the information obtained from the assessment, what kind of

accommodations, modifications, or specialized instruction the student might

require.  (Tr. at 498.)  In this particular case, Camacho received the eye report from

J.S.' ophthalmologist, Dr. Liao, which stated that J.S.' visual acuities were 20/40 in

---

[7] The Court notes that it seems that J.S. does not use any type of vision
correction, such as glasses.  (See Ex. 10 at JS 102.)  To the Court's knowledge, it is
not reflected in the record why such a vision correction is not utilized.

the better eye.  (Resp. Ex. 17 at JS 181-82.)  Applying the three criteria to the results of J.S.' eye test, Camacho determined that J.S. did not meet any of the three criteria to be considered, "visually impaired" for purposes of referring J.S. for a visual assessment.  (Resp. Ex. 17 at JS 182; Decision ¶¶ 32-33.)

Although Plaintiff contends that J.S.' ptosis or amblyopia cause J.S. decreased vision and thereby render J.S. eligible for a visual assessment under DOE criteria, Camacho confirmed that she had considered and dismissed both conditions.  (Tr. at 500.)  Camacho testified that J.S.' previous strabismus (a muscle imbalance of the eye) operation produced good results.  (Id.)  She also testified that J.S.' eyelid ptosis (droopy eyelid) had been repaired and that although J.S.' amblyopia (reduced visual acuity often related to strabismus) had been difficult to repair, the condition was not in J.S.' better eye and J.S.' ophthalmologist  recommended treatment on the weekends only as to not interfere with J.S.' schooling.  (Tr. at 500-01.)  Dr. Liao's report supports Camacho's testimony.  (Resp. Ex. 17, JS 181.)  Therefore, the Court finds no evidence whereby it can be said that J.S. has "an impairment in vision that, even with correction, adversely affects a child's educational performance . . . ." 34 C.F.R. §300.8 (13).  This is especially true due to the fact that J.S.' vision was not tested with any type of vision correction.  (Tr. at 238.)

Further, the Court finds that Plaintiff's argument that the DOE did not offer any medical testimony to refute Dr. Liao's recommendation that J.S.' vision be tested is refuted by the administrative record which shows that Dr. Liao merely suggested considering that J.S.' vision be tested further because J.S. "lacks depth perception." (See Resp. Ex. 17 at JS 181.) Camacho testified that issues related to vision perception, such as depth perception, are not the result of a "vision problem" and that vision perception instead involves how the brain intercepts messages sent from the eyes. (Tr. at 505.) Importantly, Camacho testified that ocular motor needs, which are J.S.' great weakness as demonstrated through his fine motor skills assessment (Resp. Ex. 15 at JS 138-141(J.S.' poor ocular motor strengths may impact his fine motor skills)), are not a vision impairment issue but rather an occupational therapy issue and that visual tracking issues are not directly related to vision impairment. (Tr. at 505-06.)

Moreover, Parents, on their own volition, obtained a "behavioral optometry report" instead of a functional visual assessment as requested from the DOE. (Tr. at 524.) From review of the expert testimony by Dr. Kevin Baize, a doctor of optometry who conducted J.S.' behavioral optometry assessment at Parents' request, it appears to the Court that the fine motor skills assessment conducted by the DOE in preparing J.S.' IEP was what Parents were requesting

22

when they petitioned for a "visual assessment."  (Resp. Ex. 15 at JS 138-141 (J.S.'

fine motor skills assessment analyzed, inter alia, J.S.' visual motor integration, eye-

hand coordination, spatial relations, ocular motor strengths, fine motor skills and

visual perception); Resp. Ex. 4 at JS 17-19 (J.S.' IEP).)  As Dr. Baize confirmed,

Parents are concerned about J.S.' ocular motor needs and fine motor skills.  (Tr. at

238-239 (Dr. Baize tested J.S.' "visual-motor ability" including his "visual-spatial"

ability, visual perception, fine motor skills including eye coordination, and eye

movement).)  Dr. Baize stated that J.S. tested below the first percentile in these

categories.  (Id.)  The DOE report on J.S.' fine motor skills found that J.S. had a

delay of greater than one year in fine motor, visual motor or visual perceptual

skills.  (Resp. Ex. 15 at JS 141.)  Loveland also conducted an occupational therapy

test of J.S.' visual motor skills, integration, and visual perception which concluded

that J.S.' visual perceptual and eye-coordination skills were low.  (Tr. at 55, 59, 62;

Pet. Ex. 8 at 000029; Pet. Ex. 31 at 00301-303.)  It is clear that J.S. requires

occupational therapy for his ocular motor and visual perception deficiencies,

including his depth perception as recognized by Dr. Liao.

          The DOE teacher for the visually impaired, Camacho, testified that the

"visual perception therapy" recommended by Plaintiff's expert was not supported

by scientific evidence and was specifically disclaimed by the American Academy

of Ophthalmology, the American Academy of Pediatricians, the American

Academy of Pediatric Ophthalmologists and Strabismus Specialists, and the

American Association of Orthoptists.  (See Tr. at 507.)  Camacho also testified that

the visual optometric testing, or vision therapy testing, performed by Plaintiff's

expert was not based on scientific evidence.  (Tr. at 510.)  The Court does not

suggest such therapy is necessary.  However, in line with the recommendations

obtained by the DOE through the Hawaii Center for the Deaf and Blind fine motor

skills assessment report (Resp. Ex. 15 at JS 138-141) and Loveland's similar report

by a certified occupational therapist, significant occupational therapy is necessary

for J.S.  (See also Tr. at 518 (Camacho testified that "when there are visual

perceptual issues, then you go through an occupational therapy assessment.").)

     The DOE report recommended daily occupational therapy for J.S. and

both the report and J.S.' IEP noted that "once clarification is received from [J.S.']

doctor; if appropriate IEP goals and objectives to remediate/accommodate for

ocular-motor areas of need [will be implemented] . . . . [and] if appropriate

consultation will be provided on a daily ocular-motor program for [J.S.] to

complete with adult supervision and assistance."  (Resp. Ex. 15 at JS 141; Resp.

Ex. 4 at JS 19.)  The notes to this section of J.S.' IEP imply that such follow-up by

J.S.' doctor occurred in the form of J.S.' vision report from Dr. Liao, however, as

Camacho testified, ocular motor needs are not related to vision needs—hence the DOE's denial of a visual assessment for J.S. based on Dr. Liao's report.  Through his IEP, J.S. was afforded only 540 minutes of occupational therapy per quarter. (Resp. Ex. 4 at JS 41).[8]

The Hearings Officer found that J.S.' IEP adequately addressed J.S.' ocular motor needs with supplementary aids and services, program modifications, and supports to be implemented by the teacher or one-on-one adult support. (Decision at 15.)  J.S.' IEP specifically provides for (a) visual support (pictures, charts, graphs, written information as appropriate, gestures, [and] signs); (b) visible classroom schedule with pictorial support; (c) visual representations of classroom/task directions; (d) [Student shall be] no more than 6 feet from where the teacher is located when s/he does most of the talking; (e) concrete and manipulative teaching aids or hands-on experiences; (f) teacher should stand still while talking and not move his/her head or body excessively; (g) teacher needs to face the class when talking, being careful of not talking while facing the board; and (h) 1:1 adult support (1740 minutes per week, equivalent to the full school day).

---

[8] J.S. currently receives 30 minutes of individual occupational therapy from a certified occupational therapy assistant (Tr. at 51) including "fine motor deficits, visual perceptual and visual motor deficits, gross motor, life skills and safety[]" per week at Loveland (Tr. at 53).  (See Tr. at 68.)

(Id.; Resp. Ex. 5 at JS 73.)  This Court disagrees.  The one-on-one adult support

provided by J.S.' IEP is not implemented in a form to address J.S.' occupational

therapy needs, and it is clear that J.S. needs a daily program specifically tailored to

these needs.  The issue of occupational therapy services is not on appeal and is

therefore not before this Court.  However, the Court's foremost interests are in

providing each child[9] an appropriate education under the IDEA and in that interest

recommends that the parties re-evaluate J.S.' IEP in regards to his occupational

therapy needs.   First, both the DOE's fine motor skills report and J.S.' IEP note

that clarification from J.S.' doctor is needed as to J.S.' ocular-motor needs and no

such follow-up by the DOE is apparent from this record.[10]  Second, the DOE's fine

motor skills report states that J.S. needs a daily ocular-motor program with adult

supervision and assistance for which he was not afforded or an appropriate

substitute was not delineated.[11]   This is especially disturbing to the Court, because

---

[9] From a review of the administrative record, it appears that J.S. in particular is a very sweet, energetic, sociable young child with whom it is a joy to interact.

[10] The overall extensiveness of the DOE's review of J.S.' educational needs, including J.S.' fine motor skills assessment, has been recorded, in part, in note two of this order.

[11]  The DOE report on J.S.' fine motor skills clarifies occupational therapy in the school system as:

a related service that is available to students in the special education

(continued...)

J.S.' fine motor skills impact his ability to sign, which is stressed as a significant

portion of his IEP and only serves to strengthen his need for occupational therapy.

(See Tr. at 63 (J.S.' current occupational therapist's testimony regarding J.S.' need

to improve his intrinsic muscle control as related to signing).)  Therefore, both the

procedural and substantive provisions of J.S.' IEP that relate to J.S.' occupational

therapy needs may not adequately address J.S.' ocular motor needs, visual

perception issues, or eye hand coordination.

The DOE is obligated to provide J.S. with individualized

programming which is reasonably calculated to meet his individual needs and

enable J.S. to receive educational benefits.  Under this record, the DOE performed

its procedural obligations under the IDEA to investigate Parents' re-evaluation

request for a vision assessment for J.S. by requesting an eye examination and

obtaining Camacho's review the opthamologist report.  Accordingly, Plaintiff has

failed to meet his burden of proof that the Hearings Officer erred in finding that the

--------

[11](...continued)
program who have delays in fine motor, visual motor or visual
perceptual skills of more than a year.  Occupational therapy assists
students in improving these skills so that they can function in the
educational setting. . . . [s]ervices can be delivered through a variety
of methods . . . [J.S.] demonstrates a delay of greater than one year in
fine motor, visual motor, or visual perceptual skills.

(Resp. Ex. 15 at JS 141.)

DOE had properly determined that J.S. was not "visually impaired" for the purpose of obtaining DOE a visual assessment.

II.    Alleged Substantive Violations

The IDEA requires that a FAPE be "[t]ailored to the unique needs of the [disabled] child by means of an 'individualized educational program' (IEP)." Rowley, 458 U.S. at 181.  A state need not provide a student with a "potential-maximizing education."  Id. at 197-98.  However, it must provide meaningful educational benefit for students with disabilities.  J.L. v. Mercer Island Sch. Dist., 592 F.3d 938, 951 & n.10 (9th Cir. 2010).  An IEP must be "reasonably calculated to produce benefits (i.e., learning, progress, growth) that are significantly more than de minimus, and gauged in relation to the potential of the child at issue." Blake C. v. Dept. of Educ., State of Hawaii, 593 F. Supp. 2d 1199, 1206 (D. Haw. 2009) (quotation and internal marks omitted).

In developing a child's IEP, an IEP Team shall consider the child's strengths, the concerns of the parents, the results of evaluations, and the academic, developmental and functional needs of the child.  20 U.S.C. § 1414(d)(3)(A); 34 C.F.R. § 300.324(a)(1).  In addition, in the case of a child who is deaf or hard of hearing, the IEP team must "consider the child's language and communication needs, opportunities for direct communications with peers and professional

28

personnel in the child's language and communication mode, academic level, and full range of needs, including opportunities for direct instruction in the child's language and communication mode[.]"  34 C.F.R. § 300.324(a)(2)(iv).

However, the IDEA also requires that

[t]o the maximum extent appropriate children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A).

Known as "mainstreaming" or the "least restrictive environment," this provision is designed to indicate a strong preference within the IDEA for educating handicapped with nonhandicapped children as much as possible.  See Rowley, 458 U.S. at 181 & n.4; id. at 202 ("The Act requires participating States to educate handicapped children with nonhandicapped children whenever possible.").  However, "the IDEA's preference for mainstreaming is not an absolute commandment."  Poolaw v. Bishop, 67 F.3d 830, 836 (9th Cir. 1995).  While efforts should be made to place a student in the least restrictive environment, the

29

least restrictive environment must also conform to the student's IEP.  County of

San Diego v. Cal. Special Educ. Hearing Office, 93 F.3d 1458, 1467-68 (9th Cir.

1996).

        A.     The Appropriateness J.S.' IEP Goals and Objectives and of
             J.S.' Placement at Lincoln

Plaintiff alleges that the evidence contained in the administrative

record shows that J.S.' communication mode is verbal and argue that J.S.' IEP

should reflect this preference for verbal communication. (Appeal at 14.)  Plaintiff

further argues that J.S.' placement in the Lincoln Total Communication Program,

where the focus is allegedly on sign language, is not appropriate based on J.S.'

preference for verbal communication.  (Id.)  In support, Plaintiff states that J.S. is

"a total verbal kid[,]" (Tr. at 95) and that verbal communication "[i]s always his

first choice[]" (Tr. at 96).  Plaintiff points to a speech and language assessment of

J.S. conducted by the Hawaii Center for the Deaf and the Blind in preparation for

J.S.' IEP.  The report found that J.S. "[u]ses voice most of the time[]" and

primarily uses simple sentences to communicate.  (Pet. Ex. 16 at 00160.)  Plaintiff

argues that even J.S.' special education teacher at MES acknowledged that J.S. was

"[u]sing more words and [that] his sentence structure [had] improved."  (Tr. at 466-

67.)  Plaintiff additionally points to an intellectual evaluation again conducted by

Hawaii Center for the Deaf and the Blind in preparation for J.S.' IEP that stated that J.S. "[e]xpressed himself in spoken English, using multiword sentences and appropriate articulation . . . His speech was about 70% understandable within context."  (Pet. Ex. 20 at 00179.)

Plaintiff states that the goals and objectives of J.S.' IEP and his placement at Lincoln fail to address J.S.' use of the spoken language.  (Appeal at 16-17.)  In support, Plaintiff argues that "the goals and objectives in the April 21, 2009 IEP identified as 'Oral Communication' should more aptly be called 'ASL Communication,'" allegedly because these goals require that J.S. use sign language almost exclusively.  In fact, the communication goals in the IEP require that J.S. "use sign language daily."  (Resp. Ex. 5 at JS 67-68.)  Plaintiff states that in contrast none of the verbal goals are to be practiced daily like ASL, but are to be worked on only five times during the IEP's implementation period (id. at JS 63), or over a 5-day period (id. at JS 69), or over a ten-session-period (id. at JS 70). (Appeal at 17.)  Plaintiff states that the IEP's focus on ASL is especially problematic given J.S.' limited muscle tone which is critical for developing proper sign language skills (Tr. at 97) and that therefore, the Lincoln Total Communication Program would most likely result in a very frustrating experience for J.S.  (Appeal at 17.)

31

Finally, Plaintiff also argues that in determining the educational

placement of a student, the public agency must consider the age-appropriateness of

the placement.  34. C.F.R. § 300.116(e).  Plaintiff argues that in the Lincoln Total

Communication Program, J.S. would be placed with mostly 4 and 5 year-olds.  (Tr.

at 618, 628.)  Further, Plaintiff argues that all the other students at the Total

Communications Program were deaf but not otherwise disabled, except for one 5-

year-old with Down Syndrome (Tr. at 618) and that the other students used more

sign language and had a lower level of verbal communication than J.S. (Tr. at 128-

130, 316-17.)  Accordingly, Plaintiff alleges that placing J.S. in a program that

"does not build on the verbal skills he has already developed but instead surrounds

him with younger children with much lower verbal skills" is a denial of FAPE.

(Appeal at 15-16.)

       In front of the Hearings Officer, the DOE provided testimony to show

that the IEP's were developed based on J.S.' recent assessments conducted

pursuant to the triennial evaluation.  J.S. was evaluated in the areas of academics,

behavior, cognitive, speech language, hearing, fine and gross motor skills,

social/family, and adaptive skills.  (Resp. Ex. 5.)  The IEP team also made

numerous attempts to obtain information from Loveland and invited them to attend

the IEP meetings.  (Resp. Ex. 16.)  The IEPs were developed based on all the data

which was available to the IEP team at the time of the IEP meetings.  (Resp. Ex. 5.)

The DOE argues that the Lincoln Total Communication Program was

chosen after the IEP team carefully considered J.S.' unique educational needs, in

particular his bilateral hearing loss and having Down Syndrome, and his placement

in the least restrictive environment.  (Opp'n at 16.)  In support, the DOE states that

the DOE's expert witnesses testified about the quality of the certified deaf

education teacher at the Lincoln Total Communication Program, the size of the

class, physical environment of the classroom, the qualifications of the educational

assistants in the classroom, the opportunity for J.S. to use sign language with his

peers, and how the Lincoln Total Communication Program would benefit J.S. both

academically as well as socially.

The Court finds that Plaintiff's evidence in support of their argument

is too narrowly tailored.  In citing to evaluations of J.S. in support of their

argument that J.S. is a verbal child, Plaintiff fails to note that although J.S. attempts

to use his speech, his "[w]eak oral-motor skills have impact on intelligibility[,]"

and he "[n]eeds strong visual cues and prompts to understand spoken message[,]"

"[n]eed[s] to expand comprehension through experience, hands-on activities[,]"

and "[n]eeds to learn sign language for communication purposes, both in sending

and receiving information[.]"  (See Pet. Ex. 16 at 00160-161.)  Moreover, Plaintiff

fails to provide an adequate representation of the experts' recommendations

regarding J.S.  In addition to stating that J.S. is "[u]sing more words and [that] his

sentence structure [had] improved[,]" the special education teacher at MES

qualified this statement with "[b]ut his speech clarity, sometimes it's still very hard

for us to understand what he was trying to communicate.  That's why I believe that

signing will be really good -- he still needs total communication . . . if he could

supplement with his sign language, then people . . . who also know how to sign

will be able to understand what the child is trying to express.  So the child will be

less frustrated."  (Tr. at 466-67.)  As to J.S.' intellectual evaluation, the evaluator

stated that J.S.' speech contained errors that seemed to be associated with his

hearing loss.  (Pet. Ex. 20 at 00179.)  Additionally, Plaintiff's characterization of

J.S.' IEP speech goals is similarly narrow.  In fact, J.S.' IEP provides multiple

goals related to oral communication that appear in light of his evaluations to be

appropriate to J.S.' ongoing verbal needs and skills.  (See Resp. Ex. 5 at JS 57-58,

63, 70-72.)  Also, J.S.' placement in a public school where he will be

mainstreamed for many appropriate activities will provide him with opportunities

to communicate verbally with his typically developing peers.  Moreover, as further

described below, both J.S.' evaluators and the experts who testified on behalf of

34

the DOE agreed that signing throughout the day will actually help J.S.' speech. (See Tr. at 539.)

April Yukitomo ("Yukitomo"), qualified below as an expert in Speech-Language Pathology, and a licensed speech pathologist with the DOE for the past thirty-three years (Tr. at 526), testified that she has serviced students at Lincoln's Total Communication Program classroom for approximately ten years. (Tr. at 537.)  Yukitomo testified that the Lincoln Total Communication Program teacher is certified in deaf education, which entails educational training on the mainland and a major in deaf education which is a "highly specialized field."  (Tr. at 535-36.)

According to Yukitomo, the Lincoln Total Communication Program trains the child to hear and interpret the sounds that are coming through his hearing aids.  (Tr. at 537.)  There is "intentional teaching" which incorporates auditory training, speech and language, and the signing throughout the entire day.  (Id.)  The class itself is set up for the hearing impaired population.  The classroom has carpet on the floor to absorb sounds and is air-conditioned to provide a quiet learning environment without distraction.  (Id.)  Another DOE expert testified that all the kids have their own personal hearing amplification and access to FM amplification

on top of their own hearing aids or cochlear implants as outlined in J.S.' IEP and recommended in J.S.' assessments.  (Tr. at 617-18.)

   In addition to the primary Total Communications Program teacher who is certified in deaf education, there are five or six other adults in the classroom who are either educational assistants or skills trainers.  (Tr. at 619.)  Because knowledge and skills of sign language are a requirement for being hired in the Total Communications Program (Tr. at 619), signing occurs in the classroom all day during instruction including when the teachers are speaking verbally to each other.  (Tr. at 537.)  Yukitomo stated that the children's exposure to constant signing allows signing to become second nature to them.  (Tr. at 537-38.)  Additionally, the students communicate verbally as well as sign.  (Id.)  Further, Lincoln Total Communication Program students are mainstreamed for a part of the day with the general school population, which is small.  (See Tr. at 622.)  According to J.S.' IEP, he would receive instruction in the Total Communication Program for language arts, math, social studies, science, health, music and Hawaiiana.  (Resp. Ex. 4 at JS 43.)  J.S. would be mainstreamed for physical

education, recess, lunch, assemblies and field trips[12] (Decision at 7) and his 1:1[13] would provide additional language support to J.S. through sign to supplement what he hears and help make sure that he gets as much as possible from his educational experiences.  (Tr. at 622-23.)   J.S.' assessments indicate that he has the gross motor skills necessary to participate with same age peers in gross motor activities.  (Pet. Ex. 12 at 00143.)  J.S. has normal gross motor skills and it is recommended that he has PE activities with peers of his own age for the "benefit of peer modeling as well as social interaction."  (Resp. Ex. 14 at J.S. 137.)  Physical therapy was not warranted but age appropriate activities were recommended.

Yukitomo worked with J.S. from pre-school until J.S. left MES in February 2008, about two-and-a-half years, providing him 60 minutes a week of speech therapy until he left for Loveland.  (Tr. at 528.)  She also reviewed J.S.' current speech-language assessment conducted in order to create his IEP.  (Tr. at 540; Resp. Ex. 11.)  She opined that the Lincoln Total Communication Program would provide the guidance necessary to instruct J.S. in academics because the Total Communication Program would provide J.S. a multi-modality approach

---

[12] In contrast, at Loveland the only interaction with typically-developing peers is with staff members' children.  (Tr. at 151.)

[13] As represented in J.S.' IEP, his 1:1 is qualified to sign with him throughout the entire school day.  (Tr. at 621; Resp. Ex. 6 at JS 83.)

which would incorporate the use of speech, visual aids and signing to provide J.S. with more information than just speech alone in order to ensure that J.S. understands what is being said or taught to him.[14]  (Tr. at 534-35 ("Speech is fleeting; once you say it, it's gone.  He needs multi-modality input.  That would be very beneficial for his learning."), 539.) Yukitomo explained:

> What the signing does is it teaches the child that these sounds that you hear are actually groups of sounds, and each group of sounds is a word, and each word has a meaning.  And that helps the child to understand and to develop language.  This is especially important when you're going to develop higher level language skills, such as teaching plurals or past tense, because these are the sounds that they cannot hear.  The plural sound at the end of the word or the past tense T sound at the end of [a] word is very difficult to hear.  But if you are teaching a word or using a word in the context and you sign the past tense sound, that makes it really salient for [J.S.].  So he can look at you, look at your mouth, and he sees that sign. There's a sound at the end.  And so that will help him to say his speech clearer, he's more aware of sounds within words.

(Tr. at 539.)

---

[14]  Loveland's FBA/Positive Support Plan Summary states that multi-sensory methods help J.S. achieve optimal academic performance and that J.S. "requires a small structured language based classroom with about 3-8 children[,]" taught in a multi-sensory integrated learning setting where instructions are given with a combination of verbal language, sign language and visual aides.  (Pet. Ex. 33 at 00309-10.)   J.S. also prefers a small, quiet, low-stimulus situations and reduced verbal instructions when he begins to withdraw.  (Id. at 00312-14.)  It is unclear how any of these methods are implemented into J.S.' classroom at Loveland, particularly in reference to his "typical day."  (See Pet. Ex. 32 at 00292.)

Beth King-Mock ("King-Mock"), the itinerant teacher of the deaf for the Honolulu District and qualified below as an expert witness in the area of deaf education (Tr. at 608-11), testified that the Total Communication Program would be the most appropriate educational program for J.S. (Tr. at 614.) King-Mock based her opinion on J.S.' assessments and her knowledge of the Total Communications Program and stated that J.S. needs to be able to receive and be understood in the language that is easiest for him, which in J.S.' case is a combination of both sign and speech. (Id.) According to King-Mock, "anything less would be a disservice to him." (Id.)

King-Mock stressed the importance of a certified teacher of the deaf for J.S. because she stated that "deaf education is very different from special education, which is very different from regular education." (Tr. at 615.) Specifically, she explained

> [n]ormally, hearing people get language and everything else auditorially as well as visually. And a normal brain takes a certain amount of repetition to pick up something, and if you're only getting it visually and not so much auditorially, it takes the same number of repetitions to get all the way in. And with deaf kids, they don't' always get everything that you throw at them. You can talk to them all day, and maybe they'll get it and maybe they won't. So it takes longer and it takes a more specific form of working on language.

(Tr. at 615-16.)  As to the Total Communications Program, she stated that the

program works to provide language to the children auditorially to help increase

verbal skills while increasing the amount of visual communication as a supplement

and support to make sure that language is understood.  (Tr. at 618.)  Additionally,

the need for J.S. to be in an environment where teachers are qualified to teach him

to sign was emphasized by J.S.' speech language evaluation  (see Resp. Ex. 11 at

JS 106-123), where the evaluator found that J.S. understands simple signs only (id.

at JS 108).

As to J.S.' education at Loveland, King-Mock testified that her check

on the teacher backgrounds of Loveland staff did not evidence any teacher certified

to teach deaf kids.  (Tr. at 616-17.)  In King Mock's words, "anything without the

certified teacher of the deaf is going to be of lesser benefit for any deaf child."[15]

(Tr. at 617.)  In fact, J.S.' teacher at Loveland does not hold any degrees in Special

Education (Tr. at 161), let alone deaf education, yet develops curriculum for J.S.

for all subjects besides speech and occupational therapy.  (Tr. at 162-63, 168, 174.)

Moreover, she does not work with J.S. the majority of the school day, instead, J.S.

works with a skills trainer.  (Tr. at 168, 178-79.)  Only one staff member at

---

[15]  King-Mock clarified in her testimony that her use of the word "deaf"
referred to any hearing impaired child.  (Tr. at 624-25.)

Loveland is certified to teach sign language to the hearing impaired, and she has little, if any, contact with J.S.  (Tr. at 145.)  Further, only one board certified speech pathologist works at Loveland and also does not work with J.S.  (Tr. at 137.)   The Loveland speech therapy assistant, who does not provide direct speech therapy to J.S. but supervises the trainer who works with J.S., also knows only basic signing.  (Tr. at 134, 137, 140.)   Moreover, the other children at Loveland do not sign, and J.S. cannot communicate through signing with them.  (Tr. at 100, 212.)

Even though Parents' stress that they want a program that has experience with hearing impaired children with Down Syndrome, and this is the recommendation provided in J.S.' speech assessment (Resp. Ex 11; Tr. at 549), testimony showed that no other children at Loveland currently are being treated for hearing impairment or have Down Syndrome, let alone both.  (Tr. at 42-43.)  What all parties and experts agree upon is that J.S. needs to be provided with multiple ways to communicate so that he is not frustrated by a lack of understanding.  (See Tr. at 64 ("we have been working to increase his dexterity [to sign], but if the person doesn't know sign that he's with, then he's going to become frustrated[.]"); Tr. at 97 ("not just one – one communication is not going to carry him through at this point.  He's showing strengths in different communication[.]"); Tr. at 147 (J.S.

"got frustrated when he could not effectively communicate using all languages.").)
As described Nichole Rowles, the intensive instructional service consultant and
speech pathology assistant at Loveland who is part of the team that oversees J.S.
(Tr. at 85, 86-89), at Loveland when J.S. is not understood after he tries to
communicate verbally and sign, he will just walk away. (Tr. at 148-49.) Rowles
emphasized that "having more options [of communication] builds [J.S.'] self-
esteem. (Tr. at 150; see also Tr. at 187 ("If he knew somebody knew sign
language, he would use it with his speech.").) Anna Cox,[16] who actually provides
speech language services to J.S., testified that she would use sign language with
J.S. "to keep it fresh in his mind, because I don't want him to forget signs. I think
it helps with communicating with anybody." (Tr. at 188.) Clearly, an environment
wherein J.S. can built his sign vocabulary and may be understood by his peers is a
beneficial way of increasing his means of communication.

It is important to note that J.S. is eligible to receive special education
and related services under the IDEA in the category of Hearing Impairment. (See
Decision ¶ 1; Pet. Ex. 5 at 00118; Pet. Ex. 19 at 00177.) J.S.' IDEA eligibility
team determined that hearing impaired better described J.S. than "[m]ental

---

[16] Cox testified that she has a Bachelor's of Science, with no other training in
speech therapy, and a semester of sign language. (Tr. at 183-84.)

retardation" as his reason for IDEA eligibility because he achieved an adaptive

behavior composite score of 82 from Vineland-II Survey Interview Rating Form,

which is in the low average range.  (Pet. Ex. 5 at 00118; Pet. Ex. 19 at 00177.)  In

fact, as Colin Beveridge Denney, Ph.D., Loveland's Clinical Director, testified,

although J.S. scored in the borderline range on nonverbal things in intelligence

tests geared toward those who have language disabilities or who are deaf or hard of

hearing, on verbally-orientated things J.S. scored below the first percentile.  (Tr. at

32; Pet. Ex. 37-38.)  For all the reasons above, the Court finds that J.S. requires

teaching focused on his total communication abilities and potential, not limited to

any one means of expression.

As to the make-up of the Lincoln Total Communication Program

classroom, King-Mock described the students in this year's class as two

four-year-olds, three five-year olds, two eight-year olds, and one ten-year old.  (Tr.

at 618.)  She further testified that in the classroom, one of the children has Down

Syndrome and is at J.S.' functioning level and that another student with Down

Syndrome is "pretty high functioning."[17]  (Id.)  King-Mock stated that the older

---

[17] The Court notes that although Plaintiff argues that the teacher at the
Lincoln Total Communications Program has no experience with students with
Down Syndrome, this point was not argued below (see Decision at 17) and is
moreover belied by the fact that there is at least one student with Down Syndrome
(continued...)

43

students have no disability besides hearing loss and attend the program only for language conversation emphasis.   (Tr. at 618-19.)

Although Plaintiff argues that the classroom is not age-appropriate because J.S. is eight and the majority of children are younger, in the small classroom, roughly half the class will be J.S.' actual age and J.S. will participate with typically-developing peers of his own age for physical education, recess, lunch, assemblies and field trips.  Additionally, 34. C.F.R. § 300.116(e) provides that "[a] child with a disability is not removed from education in age-appropriate regular classrooms solely because of needed modifications in the general education curriculum."  Plaintiff does not argue that J.S. should be placed in a "regular" classroom.  Moreover, academically, J.S. will not be disadvantaged as his evaluations show that in terms of his academic skills, he is within a first grade reading and writing level, kindergarten level of written expression and math, and at a four-year-old level of verbal expression.  (Pet. Ex. 5 at 00119; Resp. Ex. 9 at JS 106.)

Stephanie Olsen ("Olsen"), qualified below as an expert witness in the area of school psychology (Tr. at 561), also testified that the Lincoln Total

---

[17](...continued)
currently in the program.

Communication Program is appropriate to meet J.S.' needs.  Olsen's opinions were

based on her assessment of J.S.' functional behavior (Tr. at 562), wherein she

interviewed J.S.' mother and J.S.' teachers at both MES and Loveland and one of

J.S.' team supervisors at Loveland.  (Tr. at 565.)  Olsen also observed J.S. at both

Loveland and MES.  (Tr. at 565-66; Resp. Ex. 13.)  Olsen testified that J.S.'

placement at Lincoln in the Total Communications Program would provide the

opportunity to be with typically-developing peers as positive role models.  (Tr. at

586.)  Olsen stated that if provided the opportunity, she believed J.S. would "rise to

the level" of the kids around him who were above his skill levels.  (Tr. at 588.)

Olsen also described that being in a public school setting, as compared to being in

a special day treatment program like Loveland (Tr. at 37-38), would allow J.S. to

develop more independence.  Unlike at Loveland where it is always one-on-one for

students to adults (Tr. at 587), in a public school setting there are larger groups of

students and more opportunities to be independent and practice independent skills.

(Tr. at 586.)

Olsen testified that J.S. did not need the services of a day treatment

program like Loveland.  (Tr. at 583.)  Instead, as to support for J.S. regarding his

functional behavior, Olsen stated that in addition to the special education teacher in

his classroom at the Total Communications Program and his 1:1 full-time adult

staff member, Lincoln has staff who are trained in child behavior, functional behavioral assessments, and linking intervention ideas to those functions.  (Tr. at 595.)  Additionally, Lincoln has counselors on staff, and Olsen stated that she was one of two school psychologists for the complex.  (Id.)

The DOE is obligated to provide J.S. with individualized programming which is reasonably calculated to meet his needs and enable J.S. to receive educational benefits.  The Lincoln Total Communications Program clearly meets this standard.  From reviewing the record below, including the most recent assessments of J.S. conducted pursuant to the triennial IEP evaluation, the Court finds that J.S.' placement in the Lincoln Total Communication Program with a certified deaf education teacher and a 1:1 aide who is underlined to sign is the appropriate and the least restrictive environment for J.S. in conjunction with the goals and objectives of his IEP.

Through their arguments, Parents appear to emphasize the possibility of J.S.' short term frustration in changing environments and learning new communication methods and weigh these considerations over J.S.' long-term communication goals and needs.   Accordingly, Plaintiff has failed to meet his burden of proof that the Hearings Officer erred in finding J.S.' placement in the Lincoln Total Communications Program was appropriate for J.S. to address his

speech, language, communication, and academic needs or that the goals and objectives of J.S.' IEP were appropriate based on J.S.' individual needs.

B.    Speech Therapy

According to the IDEA, a student's IEP must include "[a] statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child, or on behalf of the child . . . ." 34 C.F.R. § 300.320(a)(4).  Therefore, the DOE is obligated to determine each student's need for related services on an individual basis as part of the IEP process.

Plaintiff argues that the Hearings Officer erred in finding that J.S.' IEP provided J.S. with appropriate minutes of direct speech therapy by finding that Plaintiff failed to provide sufficient evidence to show that the Lincoln Total Communications Program did not meet J.S.' needs or that he required additional intensive speech therapy.  (Appeal at 17.)  In support, Plaintiff states that even though J.S.' functional communication has improved dramatically since attending Loveland (Tr. at 186-87), J.S. nevertheless continues to need intensive speech therapy.  (Pet. Ex. 32 at 00308.)

Loveland's speech therapy provider, Cox, testified that the goal of J.S.' speech therapy is to get J.S. to a point where he is more functionally capable

of verbal speech.  (Tr. at 206.)  Cox, who again has no training beyond a Bachelor's of Science, administers one-on-one speech therapy to J.S. at Loveland, 30 minutes a day, five days a week, the equivalent of 150 minutes per week.[18]  (Tr. at 195.)  J.S.' IEP provides him with 1350 minutes of speech therapy per quarter (approximately 112 minutes per week) and 150 minutes per week during ESY periods.  (Resp. Ex. 4 at JS 41.)   Plaintiff also states that J.S. is seen once a week for group therapy in which they work on social skills (where there is no signing) (Tr. at 195, 212), receives speech therapy in group format during social story time once a week for an hour (where there is no signing) (Tr. at 199, 212), and works on his "speech goals" the whole day, which includes various strategies to improve his speech.  (Tr. at 196; Pet. Ex. 32 at 00305).  The record reflects that J.S. will receive a very similar curriculum in the Total Communications Program, except with the benefit of the Total Communications Program's qualified instructors for providing language skills.

---

[18] Loveland's Speech Language Therapy Progress Report notes that J.S. is attending "sign language class" and enjoys signing and is being taught to fingerspell his message to others if he does not know the sign.  (Pet. Ex. 32 at 00305.)  The Court believes that this class must refer to J.S.' family's attendance at a family American Sign Language Class (Resp. Ex. 11 J.S. 106) because the extensive testimony shows that J.S. does not learn to sign at Loveland and does not have peers or trained teachers to practice with at Loveland.

48

King-Mock stated that "every experience [in the Total Communications Program] is a language experience, and language experience is a speech experience." (Tr. at 613.) In fact, the typically developing children in the Total Communications program attend the program specifically for language conversation emphasis. (Tr. at 619.) In addition to the Total Communications Program, J.S. is provided 1350 minutes per quarter of targeted speech therapy in his IEP and 150 minutes per week during ESY periods. (Resp. Ex. 4 at JS 41.) Yukitomo testified that the speech therapy that J.S. receives at Loveland from a speech therapist would not be equal to the level of therapy he would receive from a speech-language pathologist as provided for in his IEP. (Tr. at 543-46.) Also, as Yukitomo testified, signing throughout the day will actually help J.S.' speech. (Tr. at 539.)

The Hearings Officer found Yukimoto's testimony about the proposed educational programming at the Total Communications Program credible and ruled that the 1350 minutes per quarter of speech therapy provided within "[t]he total communication program offered by Defendant was appropriate for Student because the teaching is very intentional." (Decision at 16). The Hearings Officer also found that the Total Communications Program taught "auditory training, speech and language, signing, and verbal communication every day, throughout the entire

49

school day." (Id.; Tr. at 536.)  For all the reasons above, the Court agrees that in the context of the Total Communications Program, 1350 minutes of speech language therapy per quarter and 150 minutes during ESY periods is appropriate for J.S.. to receive educational benefit.  Plaintiff fails to produce any evidence to show that J.S. requires additional minutes of speech therapy services outside of those outlined in his IEP and provided for in the Total Communications Program daily curriculum.

Accordingly, Plaintiff has failed to meet their burden of proof that the Hearings Officer erred in finding that J.S.' IEP provided J.S. with appropriate minutes of direct speech therapy and that Plaintiff failed to provide sufficient evidence to show that the Lincoln Total Communications Program did not meet J.S.' speech needs.

C.    ESY Services

The DOE must provide extended school year services only "if a child's IEP Team determines, on an individual basis, . . . that the services are necessary for the provision of FAPE to the child."  34 C.F.R. § 300.106(a)(2) (2008).  The DOE may not unilaterally limit the type, amount, or duration of ESY services.  34 C.F.R. § 300.106(a)(3)(ii).  In the comments and discussion to the 2006 IDEA Part B regulations, the U.S. Department of Education commented that:

> States . . . have considerable flexibility in determining eligibility for
> ESY services and establishing State standards for making ESY
> determinations.  However, whatever standard a State uses must be
> consistent with the individually-oriented requirements of the Act and
> may not . . . be applied in a manner that denies children with
> disabilities who require ESY services . . . access to necessary ESY
> services.

71 Fed. Reg. 46540-01, 46582-46583 (August 14, 2006).

On Appeal, Plaintiff argues that the Hearings Officer erred in finding

that ESY services after breaks of more than five school days were sufficient over

Parents' request to start ESY services after breaks of more than three days from

school.  (Appeal at 20; Decision at 16.)  In making the five day ESY services

determination in J.S.' IFP, the DOE, and Hearings Officer, relied on the fact that

when J.S.' Parents raised concerns about ESY services on April 21, 2009, the

Parents were informed that data regarding the rate of regression and recoupment

for J.S.' academic and behavioral performance was needed to confirm the request

for fewer days  (Tr. at 458; Resp. Ex. 6 at JS 81; Decision at 16) and that Parents

failed to produce any data warranting any change in the IEP regarding ESY

services.  The DOE also stated that ESY services start after a school break of five

days might be proper based the "hope" that data would be provided regarding J.S.'

recoupment and regression upon his return to Loveland after a family vacation of

approximately five days.  (Tr. at 418.)  No such data was ever provided.  (Id.)

ESY services are a component of an IEP, and the IEP must be developed to consider all of the child's special education needs.  As discussed above, the Ninth Circuit has held that the duty to assess and collect relevant information is not the responsibility of the parents, but the obligation of the district.  See Hellgate, 541 F.3d at 1209; Union, 15 F.3d at 1523-24.  As the Ninth Circuit stated in Smith:

> . . . the District was legally obligated to procure its own report from a specialist such as Dr. Siegel. The District must make "a full and individual evaluation of the child's educational needs," 34 C.F.R. § 300.531, and must "ensure ... [that the] evaluation [of the student] is made by a multidisciplinary team ... including at least one teacher or other specialist with knowledge in the area of suspected disability" (i.e., a specialist in autism).  34 C.F.R. § 300.532(e).  Any failure of the [plaintiffs] to turn over portions of a specialist's report cannot excuse the District's failure to procure the same information for itself.

Smith, 15 F.3d at 1523-24 (citing W.G. v. Board of Trustees, 960 F.2d 1479, 1484-85 (9th Cir. 1992) (parents' failure to secure participation of the child's school at an IEP meeting, even though promised by the parents, does not excuse the school district's obligation under the IDEA to secure such participation)).

In front of the Hearings Officer, Cox testified that when J.S. returns to school after only a three-day break, "[h]e's really off[,]" and that it takes more prompting and repeating to redirect him and to get him focused and that his negative behaviors tend to increase.  (Tr. at 200.)  J.S.' mother also testified that

even after the weekend, J.S. gets "out of sync [with] his normal routine" and it is difficult to transition to "Mondays" and motivate him to go to school.  (Tr. at 285.)

At the hearing on Plaintiff's Appeal, the DOE represented that because Loveland does not have long breaks, no data was obtained.  This fact does not excuse the DOE's obligation to make an independent investigation into J.S.'educational needs.  The DOE and Hearings Officer's determinations were based on absolutely no evidence related to J.S.' recoupment or regression after an absence from educational services.  Accordingly, the Court finds that the Hearings Officer erred in finding that J.S.' IEP provided J.S. with appropriate ESY services.

In sum, the Court finds that Plaintiff has failed to meet his burden to show that Parents' vision request was not properly investigated or that J.S.' IEP does not provide J.S. with appropriate speech goals, an appropriate educational placement or adequate speech therapy.  The evidence from J.S.' experience at Loveland shows that J.S.' preference for the verbal language at this point may very well be of necessity, not choice.  However, the Court again stresses the importance of investigating further J.S.' fine motor skills needs and providing him the corresponding appropriate occupational therapy.  As to the IEP's provision of ESY services, this issue is remanded to the Hearings Officer to determine what ESY services are appropriate to J.S.' educational needs.

Plaintiff argued in his request for due process hearing that J.S. requires an educational placement which includes specialized instruction to address J.S.' hearing loss, speech, or behavioral deficits, and also includes teachers and aides who have experience with children with Down Syndrome and who can utilize American Sign Language in communicating with J.S. who suffers from bilateral hearing loss. This is the education he will receive in the Total Communications Program at Lincoln with the added benefit of interacting with his typically developing peers. Further, DOE's expert Olsen even testified that J.S. does not have a mental health diagnoses warranting a need for J.S. to be placed in a mental health day treatment program like Loveland.[19]

The Court agrees with the DOE that the placement of J.S. at Loveland, in light of all the evidence submitted, is a step backward for J.S. J.S. is now in a restrictive placement with a less than vital academic curriculum, very little opportunity to learn functional communication through the use of sign language, and no opportunity to interact with children who are not disabled. Not only is the

---

[19] Citing IDEA 20 U.S.C.§1412(a)(10)(C)(ii), the DOE argues that Loveland is not a private elementary or secondary school for which reimbursement is available, and instead, Loveland is "accredited mental health day treatment program." (Opp'n at 24-25.) The DOE also argues that Parents have not made any payments to date to Loveland Academy for the 2009-2010 school year and are therefore not in need of reimbursement. (Id. at 31-32.) Because this Court affirms the Decision as to J.S.' placement, it need not reach this issue.

Lincoln Total Communications Program an appropriate education for J.S., the

record establishes that it is a better education for J.S.

CONCLUSION

For the reasons stated above, the Court **AFFIRMS IN PART AND**

**REVERSE IN PART** the Decision of the Hearings Officer.  The Decision is

**REVERSED AND REMANDED** only as to the provision of ESY services as

explained above.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, August 19, 2010.



_____
David Alan Ezra
United States District Judge

J.S. v. Department of Education, Civ. No. 10-00022 DAE/LEK; ORDER
AFFIRMING IN PART AND REVERSING IN PART DECISION OF
HEARINGS OFFICER